## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DANA MUFTI** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **C.A. 08-314** |
| | ) |
| **AARSAND & CO., INC.** | ) |
| | ) |
| **Defendant.** | ) |

### OPINION

Plaintiff Dana Mufti brings this suit against her former employer, defendant Aarsand &

Company, Inc. ("Aarsand"), which owns several Taco Bell franchises, including the Taco Bell

restaurant in Monroeville, Pennsylvania, where Mufti was briefly employed. She alleges that Aarsand

discriminated against her in her employment based on her race (Caucasian), in violation of Title VII

of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e, et seq. and the Pennsylvania Human

Relations Act ("PHRA"), 43 P.S. § 951 et seq.  She alleges that she was discharged, or, in the

alternative, constructively discharged, and subjected to a hostile work environment, in violation of

Title VII (Count I) and PHRA (Count II).  She also alleges retaliation in violation of Title VII (Count

III) and the PHRA (Count IV).

Presently before the Court is defendant's motion for summary judgment. Based on the

pleadings and evidence of record, and the briefs filed in support and opposition thereto, the court

concludes that defendant is entitled to judgment as a matter of law.

1

## I.  Background

The following facts are not in dispute, unless otherwise noted.  Ms. Mufti, who is white,

worked for Aarsand for eight shifts beginning on June 1, 2006 and ending June 16, 2006; she was

paid $9.00 per hour.  She earned a total of $495.36 in pay.  She began working for Aarsand as a

trainee, with the understanding that she would become a shift manager upon completion of her trainee

status.  She was hired by the Monroeville location's general manager, Eric Cummings, who is also

white.  During the time she was employed there were 30 employees at the Monroeville Taco Bell.

The non-management employees  included 14 Caucasians, 11 African Americans and one Filipino.

Of the four managers, three were white.

From 2006 through 2008, Mufti held numerous jobs.  Prior to working for the defendant, she

worked at Affordable Maids (3 to 4 months), PNC Bank (2 months) Echostar (2 months), RCW (less

than 1 year), and as a home caregiver (3 months).  She was employed by Premier Walls and Patio for

2 months beginning in June, 2006 after her employment with Aarsand ended.

At the time she was initially hired by defendant, Cummings reviewed with her Aarsand's

employment policies, including its discrimination and harassment policy.  Mufti watched a videotape

on harassment.  She was not given copies of the policy. Mufti understood that if someone engaged in

racial harassment, it would be investigated and subject to possible disciplinary action.  According to

defendant's "Open Door Policy," with which Mufti was familiar, if an employee needed to discuss a

problem at work, different people were available, beginning with the restaurant general manager

(Cummings), the District Manager (Daryl Yetter), Dave Czapstki, and finally, a representative of

Human Resources.  It was her understanding that she was to report anything inappropriate to her

2

supervisor, Cummings.

Ms. Mufti testified at her deposition as to various events which she asserts support her allegations of a racially hostile work environment.  It is undisputed that on her firsst day, Cummings said to her, "hey white girl" when she arrived.  He never made such a comment again.

According to Mufti, Darmeisha[1] Dean, Mufti's co-worker, would come into the restaurant hours before her scheduled shift and harass others verbally without any repercussion.  Dean repeatedly and loudly declared that she "did not want to work with white people" and that "white people are stupid."  Mufti admits that this was not said directly to Mufti.  On one occasion, Dean slapped the face of a Caucasian employee in front of a manager with no repercussion.  Mufti claims that Dean would come to the restaurant three or four hours prior to her scheduled starting time harassing others and would "run around the store ranting and raving and basically doing what she wanted to do."  It is undisputed that the only day that Dean could have come in early– when Mufti was working – would have been June 3, 2006, and, at most, could only have been an hour early because it was a Saturday morning.

Other African American employees would make racial jokes and comments about not wanting to work with Caucasians and that Caucasians were stupid.  Ms. Mufti speculated that Cummings was aware of these events "because he was working alongside everybody and he was in the midst of everything too."  According to Aarsand, there is no evidence that any managers were aware of these comments made by Mufti's co-workers.

Arguably, Dean would let Ms. Mufti know that these racially derogatory statements were

---

[1] In her deposition and throughout her EEOC Intake Questionnaire, Mufti repeatedly and mistakenly refers to her as "Moesha."

meant for her. Once, when Mufti was kneeling on the floor preparing food, Dean asked what she was doing on her knees, implying that she was engaging in some sort of sexual act.  Mufti ignored the insult and Dean stated "I haven't begun to pick on you yet."  Later that day, after Mufti ignored Dean's insults, Dean approached Mufti and asked her if she liked her.  Mufti did not respond and Dean then asked if she liked black people.  Mufti believed Dean was taunting her.  According to Mufti, this occurred in front of Cummings.  It is undisputed that Mufti worked a mere four shifts with Dean.

Cummings testified that he was not aware of any incidents where Dean acted inappropriately towards a customer or any employees, and that he never heard Dean say anything about another employee relating to race or make a joking reference to race.  No co-workers of Mufti's confirm that Dean made any inappropriate comments directed toward Mufti.

Another Caucasian female employee, Amanda Krystek, testified that another co-worker, Taronda Bookert, would say she hated white people on almost a daily basis.  Mufti worked five shifts with Bookert.  Bookert would yell at employees, start fights, and called Krystek "white bitch" on at least two occasions and "white lying whore" once or twice.  Krystek also heard Bookert state words to the effect that "white people can't get it right" and "I hate white people."  Krystek was not offended by this language.  Cummings testified that Bookert is disabled, has a child-like mentality and may have mild mental retardation.  Krystek testified that she and others believed that Bookert was mentally unstable, and therefore, were not offended by her ramblings.  Cummings testified that he never heard Bookert say anything about another employee relating to race or make any joking reference to race.  Bookert was not identified in Mufti's EEOC questionnaire or Initial Disclosures.

According to Mufti, Cummings did not stop this harassment but seemed to sanction it.  In

4

support of this version of events, she explained that Cummings once told her that these employees were "making him black." This is the second and final statement made by Cummings of an arguably racially-hostile nature. Cummings admitted that the use of this language would violate company policy. As Mufti explained, this statement arose when some employees were having a barbecue out back, bringing ribs, chicken, sweet potato pie and collard greens. And that is when Cummings said, "[Y]eah, I think they're making me black."

Mufti testified that the focus of her allegations of racially-hostile work environment is on her co-workers, not management. "I believe that the white employees were treated badly by the African-American employees, not by the company, but by the employees themselves."

According to Mufti, she complained twice to Cummings about the work environment. First, on or about June 11, 2006,[2] her seventh day on the job, Mufti asked Cummings if he would transfer her to another location. Mufti alleges that she told Cummings she was requesting a transfer because she did not like the work environment. When asked to explain, Mufti told Cummings that earlier, on June 8, 2006 a white employee, Tara Evans, had offered her drugs when Mufti complained of back pain. Mufti took offense and assumed that Evans had offered her illegal drugs. According to Mufti, Cummings did not adequately take prompt remedial action; he did not report Mufti's complaint to his area coach, as per Aarsand's policies, nor did he conduct an investigation. When told that the June 8, 2006 incident with Evans was a reason for Mufti's transfer request, Cummings made light of the situation, telling Mufti that Evans was the "store pharmacist" who gave drugs to all of the employees, especially the women for their menstrual periods. He told her he would look into a transfer.

_____

[2] It is undisputed that Cummings did not work on June 11, 2006. Throughout her deposition, Mufti had difficulty remembering exact dates.

5

According to Mufti, she also mentioned as a reason for her transfer request the allegedly racially hostile work environment and inappropriate behavior. Cummings does not recall this, but instead, recalls that Mufti requested a transfer because she was moving and wanted a job closer to her new residence.

On Friday June 16, 2006, Mufti came into work early to speak with Cummings about the racially hostile work environment. She was scheduled to work at 3:00 p.m., but came in a few hours before her shift. This would have been her tenth day working on the job, and three working days (five calendar days) after allegedly making her first complaint. Cummings stated that he didn't believe racial tension existed at the restaurant and that one of the reasons he had hired her was because she had worked in a predominantly African American community before her current job. There is a factual dispute as to whether Mufti told Cummings she was quitting on that day. Mufti's attorney refused to allow her to answer this question during her deposition. Mufti told Cummings that the racially hostile work environment had to be addressed for her to continue working at the restaurant. She then gave Cummings a letter she had composed before speaking with him. The letter did not contain any specifics about her complaints. It states:

> June 16, 2006
> I am sorry to inform you that I am unable to work for you [sic] company with such hostel [sic] conditions. When I accepted the job I didn't think I would be put in this situation. The crew and management at this store is completly [sic] unbeleivable [sic] there seems to be a great deal of lack of respect for race. I am bringing this to your attention in an attempt for you to fix this problem in order for me to continue working here at this store and for your company. Thank you.
>
> Mrs. Mufti

She explained that the situation had gotten to the point where she could not continue working at the

6

restaurant. Cummings asked her to give him specifics and she mentioned the white employee offering her the medication and also mentioned racial comments made by Dean and Bookert. Cummings stated that Mufti should understand that she was working with "the lowest form of humanity" and that "he couldn't just fire his whole crew." Cummings refused to sign the letter and wrote "effective' on it after Mufti insisted that he acknowledge that she had made a complaint.

Afterwards, Mufti left the restaurant and did not come back to work that day on her scheduled shift. She expected that Cummings or some other corporate representative would call her. This did not happen. Aarsand employees and management believed she had quit. She never called off work prior to 3:00 p.m.; she simply did not show up at the assigned time.

As required, after Mufti "quit" on June 16, Cummings immediately called his supervisor, Darryl Yetter, the District Manager, due to the nature of Mufti's allegations of racial harassment. Yetter in turn contacted Aarsand's Human Resources Director, Sharon Smith. Smith directed Yetter and Cummings to set up immediately a team meeting with every single person that worked at the restaurant.

The day after her employment ended, Mufti came to the restaurant, according to her, to see if Cummings wanted to further discuss the matter. She was told she had been taken off the work roster. It is undisputed that Aarsand's policy provides that "[a]fter 1 day of absence without notice, Aarsand will assume that the employee has voluntarily resigned his or her position." According to Mufti, she then went home and drafted a second letter,[3] returned to the restaurant, and turned in her uniform and the second letter. According to Mufti, she asked that the letter be given to Cummings. The undated letter, addressed to Cummings, stated in part that "you justified the racism by stating that is just the

---

[3]Mufti now admits that her boyfriend drafted the letter.

7

way they are" and "you said that the reason you hired me was because you though [sic] I was used to that type of environment because I worked in Duquesne . . . It seems to me that you took my letter to be a form of quitting. That was not the case."

According to Aarsand, it was only during the EEOC investigation that Mufti claimed a second letter was sent to Aarsand, clarifying her position that she had not quit. Aarsand denies ever having received the second letter. Mufti testified that she told supervisor Adam Karelitz when she returned her uniform that there was a letter in the bag for Cummings and to make sure that he got it; Karelitz states in his affidavit that Mufti never said anything about a letter when she returned her uniform.

The team meeting was held on Monday, June 19, 2006. The entire team was present. Yetter facilitated the meeting, and discussed harassment in the work place and what constituted offensive language and inappropriate behavior. Aarsand also showed a video on the subject. When asked, each employee denied that they felt like anyone had been discriminated against or if they heard anything they felt was discriminatory.

There have been no other complaints of harassment or discrimination against Cummings or otherwise at the Monroeville location.

## II. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317 (1986). In reviewing the evidence, facts and inferences must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "This standard is applied with added rigor in

employment discrimination cases, where intent and credibility are crucial questions." Stewart v. Rutgers, The State Univ., 120 F.3d 426, 431 (3d Cir. 1997). Summary judgment must be entered in favor of the moving party "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party . . ." Matsushita, 475 U.S. at 586-87 (citations omitted).

When a moving party has carried his or her burden under Rule 56, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .." Id. (citations omitted). The nonmoving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment," and cannot "simply reassert factually unsupported allegations contained in [the] pleadings." Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir.1989) (citation omitted). However, "[i]f the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, 477 U.S. 242, 249-50 (1986) (citations omitted).

### III. Discussion

Title VII of the Civil Rights Act of 1964 "makes it unlawful for an employer 'to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.' " Kunin v. Sears Roebuck and Co., 175 F.3d 289, 293 (3d Cir.1999), citing 42 U.S.C. § 2000e2(a)(1). The scope of protection provided by Title VII includes protection against a hostile work environment that is abusive to an employee on the basis of his or her race. Cardenas v. Massey, 269 F.3d 251, 260 (3d Cir. 2001).

### A. Hostile Work Environment

Defendant argues that Plaintiff has failed to produce sufficient factual evidence to support her

9

hostile work environment claim. There are five elements that a plaintiff must prove to establish a claim for hostile work environment under Title VII: (1) the employee suffered intentional discrimination because of his or her race; (2) the discrimination was pervasive or regular; (3) the discrimination detrimentally affected the employee;[4] (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability. Clark County School Dist. v. Breeden, 532 U.S. 268, 270 (2001); Andrews v. City of Philadelphia, 895 F.2d 1469, 1472 (3d Cir.1990). The same standards apply to the claims raised under the PHRA. Jones v. School Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999).

Title VII protects only against harassment based on discrimination against a protected class; it is not "a general civility code for the American workplace." Oncale v. Sundower Offshore Services, Inc., 523 U.S. 75, 80-81 (1998). Accordingly, with regard to the first element of her hostile work environment claim, plaintiff must show that defendant's conduct was motivated by animus based on her race. The United States Court of Appeals for the Third Circuit's jurisprudence has "never required a plaintiff to demonstrate direct proof that her harasser's intent was to create a discriminatory environment." Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 278 (3d Cir. 2001). Indeed, the first prong of the inquiry was not "designed to protect harassers who fail to recognize the hostile or abusive nature of their comments and actions." Id. And it is improper to parse through the plaintiff's evidence in search of a link between the harasser's conduct and a discriminatory animus in his or her mind. Id. at 277-78. Instead, "[t]he proper inquiry at this stage [is ascertaining] whether a reasonable factfinder could view the evidence as showing that [the plaintiff's] treatment was attributable to her [race]." Id. at 277. In other words, the intent to discriminate can be

---

[4]Aarsand does not dispute the third element.

10

inferred from the entire context and the conduct of the actors involved.

The second element requires a plaintiff to show that the discrimination was "severe or pervasive" to constitute a hostile work environment. Clark County, 532 U.S. at 270. The United States Supreme Court has observed that "hostile work environment" harassment must be pervasive or severe enough "to alter the conditions of ... employment and create an abusive working environment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986), quoting Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir.1982). The test looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it interferes with an employee's work performance. Harris v. Forklift Systems., Inc., 510 U.S. 17, 21 (1993); see McGraw v. Wyeth-Ayerst Laboratories, Inc., 1997 WL 799437 (E.D.Pa. Dec.30, 1997) (discussing Meritor Savings); see also Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) ("Conduct must be extreme to amount to a change in the terms and conditions of employment."). In other words, in analyzing whether a plaintiff has established a prima facie case, the court cannot confine its analysis to "the individual pieces of evidence alone," but must "view the record as a whole picture." Abramson, 260 F.3d at 276, citing Woodson v. Scott Paper Co., 109 F.3d 913, 921 (3d Cir.1997)). This is because "[a] play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but the overall scenario." Id., quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir.1990). "[O]ffhanded comments and isolated incidents (unless extremely serious) are not sufficient to sustain a hostile work environment claim. Rather, the conduct must be extreme to amount to a change in the terms and conditions of employment." Id. at 262 (quotations and citations omitted). As Title VII is not a

"general civility code ... [T]he ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" do not support a hostile work environment claim. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (quotation omitted).

The standards governing employer liability for a hostile work environment differ depending on the source of the hostility. Clark v. United Parcel Services, Inc., 400 F.3d 341, 348 (6th Cir.2005). Imputing liability for co-worker harassment (in this case the alleged comments of Dean and Bookert) is grounded in the employer's direct negligence. Ocheltree v. Scollon Productions, Inc., 335 F.3d 325, 333-34 (4th Cir. 2003). Where a co-worker is the source of the hostile environment, "liability exists where the defendant knew or should of known of the harassment and failed to take prompt remedial action." Kunin, 175 F.3d at 293, quoting Andrews, 895 F.2d 1486; see also Clark, 400 F.3d at 348.

As to whether Mufti's supervisor's comments support a hostile work environment claim, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." Faragher, 524 U.S. at 807. This liability is predicated on the theory that the "tortious conduct is made possible or facilitated by the existence of the actual agency relationship." Durham Life Insurance Co. v. Evans, 166 F.3d 139, 150 (3d Cir. 1999). Liability is divided into two categories: (1) where no tangible employment action is taken, the employer may raise an affirmative defense predicated on the exercise of reasonable care to prevent harm; (2) no defense is available, however, where the supervisor's harassment culminates in "tangible employment action." Id., quoting Faragher, 524 U.S. at 808. A tangible employment action is one that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington

12

Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998). It likewise may be established by demonstrating a materially adverse change based upon other indices that are unique to the particular situation. Id., citing Crady v. Liberty National Bank and Trust Co. of Indiana, 993 F.2d 132, 136 (7th Cir.1993).

After carefully reviewing the submissions of both parties, we find that the alleged racially discriminatory remarks and incidents of which Mufti complains do not rise to the level of a hostile work environment, i.e, one in which "the workplace is permeated with discriminatory intimidation, ridicule and insult." Amati v. U.S.Steel Corp., 2007 WL 3256850, *16 (W.D. Pa. Nov. 2, 2007); Jordan v. Mel Blount Youth Home of Pennsylvania, 2008 WL 2446334, *5 (W.D. Pa. 2008). We are guided by the caselaw in this circuit.

In Caver v. City of Trenton, 420 F.3d 243 (3d Cir. 2005), relied upon by Aarsand in its brief in support of its motion for summary judgment, "no racist comment, written or spoken, was ever directed at [the plaintiff] himself." Id. at 263. In that regard, the court held that a plaintiff cannot meet the first element of the hostile work environment claim under Title VII – causation – "solely by pointing to comments that were directed at other individuals" because the plaintiff "cannot show that the comments would not have been uttered or written but for his race if [the plaintiff] was neither on the receiving end nor the subject of any comments." Id. at 263. Specifically, the court noted that "although there was some evidence ... of inappropriate racist comments, graffiti, and flyers, this evidence was insufficient without more to establish a hostile work environment." Id. However, while such racist comments "cannot alone be the basis of the hostile work environment claim, evidence of those comments may be considered in determining whether facially neutral conduct on the part of [the plaintiff's supervisors] was actually based on [the plaintiff's] race." Id. at 264.

In Woodard v. PHB Die Casting, 255 Fed. Appx. 608, 608-609, 2007 WL 3257201, 1 (3d

13

Cir. Nov. 6, 2007), the United States Court of Appeals for the Third Circuit affirmed the district

court's granting of summary judgment in favor of defendant employer in a case involving allegations

of a racially hostile work environment.  The court summarized the facts as follows:

> Woodard worked at defendant PHB Die Casting's facility in Fairview,
> Pennsylvania, from 1998 through 2003. He contends that during that time, he
> experienced and heard second-hand about a number of allegedly racist comments by
> co-workers and that he was given less favorable job assignments than non-African
> American employees. Specifically, he testified at his deposition: that he saw a burning
> cross and KKK sign drawn on a bathroom wall in 2002, and that management failed to
> have it removed for at least three months after he reported it; that his supervisor
> consistently gave him more physically demanding tasks at more complex machines;
> that he was told by co-workers about blatantly racist comments that had been made by
> other co-workers; and that more ambiguously racially charged comments were directed
> to him by co-workers. In addition, Woodard introduced evidence that a supervisor at
> PHB's Fairview facility agreed to attend diversity training in response to complaints in
> 2001 but never actually attended the class. The District Court found this evidence
> insufficient to establish a prima facie case for either a hostile work environment or
> disparate treatment claim under Title VII, 42 U.S.C. § 2000e et seq. , or the
> Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. § 951 et seq. We agree.

Id. at *1 (record citations omitted).  The court found that there was insufficient evidence to support

Woodard's racially hostile work environment claim, stating:

> Over the course of three years, Woodard claims that he was twice asked
> questions using the phrase "you people," once asked what his race was, and once
> asked if he intended to complete a drug deal during a bathroom break. Even assuming
> these somewhat ambiguous incidents were related to Woodard's race, they are the type
> of offhand comments that are insufficient to support a hostile work environment claim.
> See Caver, 420 F.3d at 263. While the KKK-related graffiti and PHB's alleged failure
> to remove it promptly are more serious, this one incident, even in conjunction with the
> comments discussed above, is not enough for a trier of fact to conclude that
> discriminatory conduct in the workplace amounted to a change in the terms or
> conditions of Woodard's employment.

Id. at 609-610.

Similarly, in Perry v. Harvey 2009 WL 1566791, *2 -3 (3d Cir. June 5, 2009), an African-

14

American civilian police officer sued the United States Army for hostile work environment and

retaliation. The court explained:

> In this case, most of the evidence upon which Perry relies is not probative of discriminatory animus, much less severe or pervasive enough to support a hostile work environment claim. Over an eight-month period in 2003, Perry's police vehicle was reassigned; he was prohibited from attending a picnic as the department's Drug Abuse Resistance Education (DARE) representative; he was prohibited from working overtime; and he was temporarily marked AWOL by Graham-Morris [plaintiff's immediate supervisor]. However, Perry does not rebut the Army's legitimate explanations for each of these actions: Perry was assigned to desk duty and his vehicle was needed for patrols; Perry was no longer the department's D.A.R.E. representative at the time of the picnic; the department implemented a policy against overtime; and Graham-Morris justifiably, albeit wrongly, believed Perry was AWOL because he cleared his absence with a different supervisor. Perry cites racist remarks made by Graham-Morris's husband on two occasions, but these statements are not germane to Perry's hostile work environment claim because the husband was not employed by the police department and Perry offers no evidence to justify imputing his remarks to Graham-Morris. Even accepting Perry's version of these events-as we must at summary judgment-they do not support a hostile work environment claim.

> Some of Perry's allegations, however, may be probative of a hostile work environment. In 2000, Perry once overheard Graham-Morris "refer to men of color as being dumb and useless." In 2003, Graham-Morris denied Perry leave to take his mother to a doctor's appointment, and wrongly advised him to report to a "phantom" meeting with the police chief. Most significantly, in late 2003, Graham-Morris approached Perry while sitting in a parked vehicle after his shift and asked, "What are you doing here, boy?" Finally, in 2004, Graham-Morris asked Perry for verification that he had taken a drug test, although such verification was not normally requested from other officers.

Despite this evidence, the appeals court held that summary judgment was properly

granted in favor of the defendant, on the grounds that plaintiff's treatment was not severe or

pervasive enough to "to alter the conditions of [Perry's] employment and create an abusive

working environment," National R.R. Passenger Corp. v. Morgan, 536 U .S. 101, 116 (2002),

or to "detrimentally affect a reasonable person ... in that position," Weston v. Pennsylvania,

15

251 F.3d 420, 426 (3d Cir. 2001); Perry, 2009 WL 1556791 *2.   The Court explained:

>  Perry's hostile work environment claim boils down to allegations that over the course of 10 months, Graham-Morris denied a leave request, lied to him about a meeting, requested verification of a drug test, and called him "boy."

>  Indeed, Perry concedes that the majority of this conduct was "petty in nature," but argues that the "boy" comment was severe enough to violate Title VII by itself.  Accepting Perry's requested inference that "boy" was a racially motivated epithet, it does not rise above an "offhanded comment," Caver, 420 F.3d at 262, or "sporadic ... abusive language," Faragher, 524 U.S. at 788. The Supreme Court has held that the "mere utterance of an [ethnic or racial] epithet which engenders offensive feelings in a [sic] employee does not sufficiently affect the conditions of employment to implicate Title VII." Harris v. Forklift Sys. Inc., 510 U.S. 17, 21 (1993) (quotation omitted).

>  Viewing the "overall scenario" in the light most favorable to Perry, Caver, 420 F.3d at 263, we hold that no reasonable jury could conclude that the Army's conduct was severe or pervasive enough to create a hostile work environment.

Id. at *2-3 (record citations omitted).

In Harris v. SmithKline Beecham, 27 F.Supp.2d 569 (E.D. Pa.1998), aff'd, 203 F.3d 816

(3d Cir. 1999) (unpublished table decision), the district court granted summary judgment in

favor of defendant employer on plaintiff's hostile work environment claim on the grounds that

the plaintiff "produced no evidence that the actions of [the defendant] were physically

threatening or interfered with her ability to do her job." Id. at 578. The court further noted that

the alleged racial comment made to the plaintiff by her supervisor, who asked the plaintiff if she

was happy that there were more black people in the department"– was "isolated and not severe."

Id. The other acts of which the plaintiff complained, such as lack of opportunities, undesirable

assignments and lack of institutional support in the form of training or updated software, "were

16

sporadic and infrequent such that they cannot be said to characterize the environment in which [the plaintiff] worked." Id.

Similarly, in Morgon v. Valenti Mid-Atlantic Management, 2001 WL 1735260 (E.D. Pa. Dec.14, 2001), the court dismissed the plaintiff's hostile work environment where the plaintiff alleged that during the approximate one year that plaintiff worked for defendant, she was called a "n____," that her supervisor made a comment about not hiring Jamaicans, that she was called "illiterate," and that she was assaulted by her supervisor. The court held that the discrimination alleged by the plaintiff was not pervasive, and the "illiterate" comment and the assault were "not tied into plaintiff's color or race." Id. at *3; see also Rose v. Woolworth Corp., 137 F.Supp.2d 604, 608, 611 (E.D.Pa. 2001) (granting summary judgment to defendant on hostile work environment claim where plaintiff alleged that supervisor subjected plaintiff to "constant and unremitting negative comments and evaluations" based at least in part on plaintiff's race, referred to black community as a "baby factory," stated that blacks are incapable of thinking analytically, and warned the plaintiff, who was black, not to talk to white women); Francis v. Chemical Banking Corp., 62 F.Supp.2d 948, 959-60 (E.D. N.Y.1999) (granting summary judgment in favor of employer on plaintiff's hostile work environment claim where plaintiff alleged that a supervisor had called a group of African-American employees "f____g moolies," another supervisor referred to a co-worker as "n____," a third supervisor questioned the use of giving money to the United Negro College Fund, and plaintiff found written on his workstation, "All 'n____s' should go back to Africa with a Jew under each arm").

Based on the foregoing case law, and given the overall scenario of Mufti's short employment history with Aarsand, we conclude that summary judgment should be granted in

17

favor of Aarsand with respect to Mufti's hostile work environment claim. When each incident underlying Mufti's complaints is examined in context and considered in conjunction with the responsive actions taken by Aarsand, the record fails to reflect sufficient evidence of discriminatory treatment based on race.

As set forth in more detail supra, the allegations against Cummings, Mufti's white supervisor, involve two comments: first, "Hey, white girl" on her first day of employment, and second, "They're making me black," in reference to food items brought to an employee barbeque. Mufti appears not to be pursuing a cause of action based on direct liability for her supervisor's comments: she admitted during her deposition that she was treated the same as all white employees and said, "I believe that the white employees were treated badly by the African-American employees, not by the management, not by the company, but by the employees themselves." Mufti Dep. at 171.   This is not a disparate impact  case but rather, a case where Mufti must show that she herself was intentionally harassed because she is white. Even so, these two offhand comments by Mufti's white supervisor hardly trigger direct liability on the part of Aarsand. In fact, the comment about the kinds of food being brought to an employee barbecue (ribs, chicken, sweet potato pie and collard greens, which were "making [Cummings] black") suggests a stereotype of African Americans, not harassment against Mufti herself.

We also find that, even taking into consideration Cummings' statements just described, Mufti's evidence as to co-worker, as opposed to supervisor, conduct is insufficient as a matter of law. A reasonable jury could not conclude that Mufti was subjected to a hostile work environment because what she experienced was not severe or pervasive enough to "to alter the

18

conditions of [her] employment and create an abusive working environment," Nat'l R.R.
Passenger Corp., 536 U .S. at 116, or to "detrimentally affect a reasonable person ... in that
position," Weston, 251 F.3d at 426. Mufi's hostile work environment claim boils down to
allegations that over the course of less than two weeks, two co-workers who worked with her at
the most five shifts made some comments that do not appear to on their face to be race-related:
when Dean asked Mufti when she was on her knees, 'what are you doing on your knees?" and
later, Dean said, "I'm not picking on you, don't worry, I haven't begun to pick on you yet."
Dean then allegedly asked Mufti, "Don't you like me?" Dean's question, "don't you like black
people?" which she directed to Mufti hardly rises to the level of being severe or pervasive
enough to create an abusive working environment.

In Mufti's sworn affidavit she attempts to show that Dean's comments were frequent.
She states, "During our shifts together there were times [Dean] would yell or loudly make
racially insensitive comments to everyone and no one in particular" and that "[Dean] made these
loud racial comments on a consistent basis throughout our shifts," Mufti Aff. ¶¶ 5, 7. In
response to these allegations, defendant asked a series of questions of Mufti during her
deposition, which established that, even assuming arguendo that Mufti heard an inappropriate
comment by Dean every time they worked together, at the most, they worked together for four
shifts, overlapping: a half hour on June 1, 2006, nine hours on June 3, 2006 four hours on June
6, 2006 and five and a half hours on June 12, 2006, for a total of 19 hours. Despite the
undisputed schedule, Mufti claims that Dean came in early before her shift and ranted
inappropriately. However, it is undisputed that there was only one day when Dean could have
come in early before her shift, June 3, 2006.

19

Mufti admits that nearly all remaining comments were not directed to her, but instead, were heard by other people. Aarsand aptly notes that such comments, therefore, may be inadmissible hearsay. Mufti relies on what others told her Bookert said with regard to not liking white people, and the story that Bookert once called Krystek a "white lying whore." Cummings testified that he never heard any such comments, and Krystek testified that she had no knowledge that he ever heard any such comment. Again, these comments were not directed at Mufti, and others in the employ of defendant disregarded them because they believed Bookert to be mentally unstable. At her deposition, Krystek agreed that Bookert made comments to the effect that she "hated white people" (but denied that Dean made such comments). She characterized Bookert's remarks as laughable, and that she "didn't see anyone get hurt or anything by remarks . . . It was just, you know, comments all just messing around...." She explained, "there was black people joking around with black people and white people with the white people. I mean, it was mixed up, too." Viewing the "overall scenario" in the light most favorable to Mufti, Caver, 420 F.3d at 263, we hold that no reasonable jury could conclude that the employees' conduct was severe or pervasive enough to create a hostile work environment.

Similarly, we find Mufti's inference that she was subject to racially motivated epithets does not rise above an occasional, "offhanded comment," Caver, 420 F.3d at 262, or "sporadic ... abusive language," Faragher, 524 U.S. at 788. The Supreme Court has held that the "mere utterance of an [ethnic or racial] epithet which engenders offensive feelings in a[sic] employee does not sufficiently affect the conditions of employment to implicate Title VII." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (quotation omitted). The conduct which Mufti describes is not sufficiently frequent, severe, or pervasive enough, as a matter of law, to rise to

the level of a hostile work environment.

With respect to the fourth element, i.e. whether a reasonable person of the same race in her position would be detrimentally affected by the alleged discrimination, we find that there is no genuine issue of material fact as to this element. There is no evidence that any other employees in the work environment were offended by the alleged comments, and Mufti claims that the other white employees were treated just like her. In response to a question about Bookert calling Krystek a "white bitch" on at least two occasions, Krystek said, "She was crazy. . . I mean she was mentally unstable. . . I didn't take offense to it because it was by her. And then she didn't really even know what she was saying, because a second later she would just be like, okay. So what's up? Like, she just was weird." Cummings' testified similarly, characterizing Bookert as being disabled and having a child-like mentality. We find that Mufti has not shown that a reasonable white person would have been offended by this alleged conduct, and therefore, summary judgment is appropriate in this regard as well.

As noted supra, in order to establish employer negligence, the plaintiff must show that management knew or should have known about the harassment, but "failed to take prompt and adequate remedial action." Andrews, 895 F.2d at 1486. An effective remedy – one that stops the harassment – is adequate per se. Knabe v. Boury Corp., 114 F.3d 407, 411-12 n. 8 (3d Cir.1997). Even if not effective, an employer's remedial measure is nonetheless adequate if "reasonably calculated" to end the harassment. Id. at 412-13 (internal quotation omitted). Moreover, the remedy need not include discipline to be adequate. In Knabe, for example, the employer found insufficient evidence of harassment to justify disciplinary measures against the offending employee. Id. at 413. Nonetheless, because the employer promptly met with the

alleged harasser and informed him of the company's strong policy against sexual harassment, the court found the remedy adequate as a matter of law. Id.

Mufti's evidence that she provided Aarsand adequate notice of harassment –twice – is weak at best. It is undisputed that the first time Mufti complained to Cummings, on or about June 11, 2006, she stated that she wanted to transfer to a different location because a white employee had offered her illegal drugs. This conduct cannot be construed as a complaint of racial harassment; the woman who offered her the medication was white, and made no mention of race. There is no dispute that when Cummings and Mufti discussed the situation on June 16, 2006, that is, when Mufti raised the racial harassment allegations with Cummings, that Cummings immediately contacted his superiors and put in motion the company's harassment policy. We find that no reasonable juror could believe Mufti's claim that she complained of racial harassment on June 11, 2006. Cummings testified that he was not aware of any of the comments at that point in time, and that he thought Mufti requested the transfer because she was moving. In addition, given the brief time in which Mufti and her alleged harassers worked together, the limited number of instances that the offensive conduct could have occurred, and the fleeting nature of the derogatory language, Aarsand reasonably failed to discover the harassment alleged by Mufti. Kunin, 175 F.3d at 294. Mufti clearly had difficulty with fellow employees' language and conduct, but Aarsand was not notified that its employees' alleged conduct was of an ongoing, racially offensive nature.

With respect to Mufti's complaints of racial harassment on June 16, 2006, which was a Friday, again, Aarsand's reaction was prompt and remedial: A meeting was held the next weekday, a Monday. Aarsand asked anyone if they had any complaints, and no one indicated

22

they had any issues with their working environment. Aarsand's management explained their
hostile work environment and harassment policy to all employees and the employees
acknowledged the guidelines and what conduct constitute harassment.

For all of these reasons, we find that summary judgment should be entered in favor of
the defendant with respect to Counts I and II.

### B. Counts II and IV: Retaliation Claims

Mufti further alleges that she was taken off the schedule, or terminated, in retaliation for
complaining about the harassment at work. To state a prima facie case of retaliation, she must
show that: (1) she engaged in a protected activity; (2) Aarsand took a materially adverse
employment action which would have dissuaded a reasonable worker from making or
supporting a charge of discrimination; and (3) a causal link exists between the protected activity
and the adverse employment action. Weston v. Pennsylvania, 251 F.3d 420, 430 (3d Cir. 2001),
abrogation recognized by Meyer v. Nicholson, 441 F.Supp.2d 735 (W.D. Pa. 2006).

A plaintiff must participate in a protected activity to establish a retaliation claim. See
Barber v. CSX Distribution Services, 68 F.3d 694, 700-701 (3d Cir.1995) (finding a general
letter of complaint that did not mention discrimination was not a protected activity). Protected
activity includes formal charges of discrimination "as well [as] informal protests of
discriminatory employment practices, including making complaints to management, writing
critical letters to customers, protesting against discrimination by industry or society in general,
and expressing support of co-workers who have filed formal charges." See e.g., Sumner v. U.S.
Postal Service, 899 F.2d 203, 209 (2d Cir.1990).

However, to constitute "protected activity," the employee must also have a "good faith,

reasonable belief that a violation existed ." Aman v. Cort Furniture Rental Corp., 85 F.3d 1074,

1085 (3d Cir. 1999). In Moore v. City of Philadelphia, 461 F.3d 331, 341 (3d Cir. 2006), the

Court of Appeals for the Third Circuit explained:

> Whether the employee opposes, or participates in a proceeding against, the
> employer's activity, the employee must hold an *objectively reasonable* belief, in
> good faith, that the activity they oppose is unlawful under Title VII. Clark County
> v. Breeden, 532 U.S. 268, 271, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per
> curiam) (rejecting retaliation claim where "[n]o reasonable person could have
> believed that" the underlying incident complained about "violated Title VII's
> standard" for unlawful discrimination).

(emphasis added).

In Wilkerson v. New Media Technology Charter School, Inc., 522 F.3d 315, 322 (3d Cir.2008),

the court stated: "To put it differently, if no reasonable person could have believed that the

underlying incident complained about constituted unlawful discrimination, then the complaint is

not protected."

Based on our analysis more fully stated supra, we find that no reasonable person could

believe that the comments and incidents complained about by Mufti constitute unlawful

discrimination, and therefore, summary judgment is appropriate in favor of Aarsand as to the

retaliation claims as well.

Even if Mufti had met her prima facie burden, the burden would then shift to Aarsand to

proffer a legitimate, non-discriminatory reason for her alleged termination. We again note that

in reviewing the evidence, facts and inferences must be viewed in the light most favorable to the

nonmoving party, Matsushita, 475 U.S. at 587, and that "[t]his standard is applied with added

rigor in employment discrimination cases, where intent and credibility are crucial questions."

Stewart, 120 F.3d at 431. We find that no reasonable fact-finder would believe Mufti's story

24

that she was fired in retaliation (rather than voluntarily quit) after she complained about racial

harassment. Instead, a reasonable factfinder must conclude that Mufti quit on June 16, 2006

when she failed to show up without explanation or notice for her shift at 3:00 p.m. that day. It is

clear that Aarsand had every reason to follow its established policy of removing her from the

roster on June 17, 2006 on the grounds of her absence without notice the prior day. Mufti

arrived at work a few hours before her shift started, had her discussion with Cummings, did not

have on her uniform, told Cummings she was quitting, and did not return to work for her

scheduled shift. Her second letter was undated, lacks credibility, is uncorroborated, and was

never received by Aarsand.

Finally, we note that Mufti claims that even if we find that she resigned, her resignation

constitutes a constructive discharge. An employer may be liable for constructive discharge under

Title VII. Pennsylvania State Police v. Suders, 542 U.S. 129, 143 (2004). In Suders, the

Supreme Court stated that a hostile-environment constructive discharge claim "entails

something more" than a hostile work environment claim, as it also requires the claimant to show

"working conditions so intolerable that a reasonable person would have felt compelled to

resign." Suders, 542 U.S. at 147. Mufti has failed to substantiate an actionable hostile work

environment claim; accordingly, she also fails to meet the more stringent requirements of a

hostile-environment constructive discharge claim.

## IV. Conclusion

We conclude that Ms. Mufti has not adduced evidence sufficient to create a genuine

issue of material fact as to whether the she was subjected to a racially hostile work environment

25

as well as retaliation and intentional discrimination. Reviewing the evidence in the light most favorable to Plaintiff and resolving all reasonable inferences in her favor, the Court finds that she has presented insufficient evidence to raise a genuine issue of material fact. Accordingly, Defendant's Motion for Summary Judgment will be granted.

An appropriate order will be entered.

Date: October 22, 2009

Maurice B. Cohill, Jr.
Senior United States District Court Judge

26